## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 27 2019, 10:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

L.M., Z.M., A.S. & E.S. (Minor Children)

And

M.S. (Mother) and J.M. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

November 27, 2019

Court of Appeals Case No.
19A-JT-484

Appeal from the Jennings Circuit Court

The Honorable Jon W. Webster, Judge

Trial Court Cause No.
40C01-1807-JT-15, 40C01-1807-JT-16, 40C01-1807-JT-17, & 40C01-1807-JT-18

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondents, M.S. (Mother) and J.M. (Father), appeal the trial court's Order terminating their parental rights to their minor daughters, Z.M., L.M., and A.S. Mother also challenges the termination of her parental rights to her son, E.S.

We affirm.

## ISSUE

Although Mother and Father have filed separate appellate briefs, we consolidate the issues they raised and restate as the following single issue: Whether the trial court's Order terminating Mother's and Father's parental rights was supported by clear and convincing evidence.

## FACTS AND PROCEDURAL HISTORY

Mother and Father are the biological parents of Z.M. born on December 20, 2013; L.M. born on May 28, 2014; and A.S., born on May 18, 2016. Prior to Mother's relationship with Father, Mother and S.W.[1] had E.S., born on June

---

[1] S.W., the biological father of E.S., does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's and Father's appeal.

10, 2010. In 2016, Mother was living with Z.M., L.M., A.S., and E.S. (collectively, Children) in her sister's home in Jennings County, Indiana.

[5] On September 1, 2016, the Jennings County Department of Child Services (DCS) received a report, alleging that the Children were victims of child abuse or neglect with "Mother as the perpetrator." (Appellant's App. Conf. Vol. II, p. 50). When DCS visited Mother's sister's home, DCS observed "some gunky substance" in the refrigerator, the bathroom was "full of trash and clothes," the kitchen sink was "full of dirty dishes," and the living room was packed with "debris of clothes and blankets." (Transcript Vol. II, p. 11). DCS found that the Children lacked "appropriate bedding," and "most of them were running around in dirty diapers." (Appellant's App. Conf. Vol. II, p. 50; Tr. Vol. II, p. 8). Following that visit, DCS removed the Children, placing Z.M., L.M., and A.S. with Father, and E.S. with maternal grandmother (Maternal Grandmother).

[6] On September 7, 2016, DCS filed separate Petitions, alleging that the Children were in need of services (CHINS). At the initial hearing, Mother and Father appeared and denied the allegations pertaining to Z.M., L.M., and A.S. Mother also denied the allegations relating to E.S. During another dispositional hearing on December 7, 2016, Mother and Father appeared and admitted the allegations in the CHINS petitions. At the time of the hearing, Father was "pretty bad off on heroin and methamphetamines" and was not capable of caring for daughters Z.M., L.M., and A.S. (Tr. Vol. II, p. 110). As such, Father requested that his daughters be removed from his care and be

placed with his aunt (Aunt).  On December 20, 2016, based on the admissions made by Mother and Father, the trial court adjudicated the Children as CHINS.  The trial court ordered Z.M., L.M., and A.S., to be placed with Aunt, but E.S. to remain with Maternal Grandmother.

[7]    On March 17, 2017, the trial court issued a dispositional order.  In pertinent part, Mother was ordered to maintain suitable safe and stable housing for the Children, keep her residence clean and free from clutter, and "assist in a protection plan which protects the [C]hildren from neglect."  (Appellant's App. Vol. II, p. 38).  Father was ordered, among other things, to contact the family case manager assigned to the case every week, attend all scheduled visitations, obey the law, notify DCS of any arrests of criminal charges, and maintain safe and stable housing.

[8]    During a review hearing on April 27, 2017, Father failed to appear.  The trial court found that Mother had complied with the case plan, cooperated with DCS, participated in services, consistently visited the Children, and had enhanced her parental abilities.  Father, however, had only visited Z.M., L.M., and A.S. three times since their removal, and had not cooperated with DCS.

[9]    In June 2017, Father was charged with nonpayment of child support of his daughters Z.M., L.M., and A.S.  On July 21, 2017, family case manager Jennifer Carroll (FCM Carroll) visited Mother's sister's home and noted some progress, although "roaches" were present.  (Appellant's App. Conf. Vol. II, p. 52).  On July 21, 2017, six family case managers went to Mother's sister's home

to help Mother "continue to clean out her home and get rid of several items." (Appellant's App. Conf. Vol. II, p. 52).

[10] In August 2017, DCS learned that Father and his girlfriend were living in Aunt's home without DCS's permission even after he had been told he could not reside there. At the time, Father was not participating in any of the ordered services. DCS also had additional concerns regarding Father's "judgment to allow his girlfriend to live in [Aunt's] home" since Father's girlfriend had an "open DCS case against her and was a known drug user." (Appellant's App. Conf. Vol. II, p. 52). Also, DCS was concerned that there were "fleas and roaches" in Aunt's home. (Appellant's App. Conf. Vol. II, p. 52). Based on all of DCS's concerns, DCS removed Z.M., L.M., and A.S. from Aunt's home and placed them with Maternal Grandmother.

[11] Between September 2017 and October 2017, Joyce Harden (Harden) of the Ireland Home Based Services supervised Mother's visits with the Children. Mother only attended nine visits out of the thirteen. During the visits, Mother often showed up with inappropriate and insufficient food and drinks for the Children. On October 20, 2017, multiple FCMs showed up at Mother's sister's home for another Community Clean Up Day. Mother was not home to help with the cleanup. In November 2017, while Father still not in compliance with his case plan, Mother had complied with all DCS's services, followed all recommendations, made necessary changes, and visited Children. Based on Mother's progress, DCS recommended that Mother have unsupervised visits with the Children, including overnight visits. The goal at that time was to

transition to a "Trial Home Visit and Reunification." (Appellant's App. Conf. Vol. II, p. 85).

[12] In February 2018, Mother moved out of her sister's home and moved into a small two-bedroom trailer. FCM Carroll visited Mother's trailer and found it to be in good condition. In that same month, Mother's working relationship with her home-based case worker, Harden, ended when Mother indicated at a child and family team meeting that Harden was a "bitch" and that she wanted to "punch [Harden] in the face." (Appellant's App. Conf. Vol. II, p. 52). Ireland Home Based Services terminated its services due to the threat Mother made to Harden, and "due to the fact Mother had missed every single appointment between November 2017 and February 2018." (Appellant's App. Conf. Vol. II, p. 96).

[13] In March 2018, DCS visited Mother's trailer and discovered that it had no running water. In the same month, FCM Carroll visited Mother's trailer and noted that Mother did not "consistently have electricity" and the porch "roof was leaking badly with nails exposed." (Appellant's App. Conf. Vol. II, p. 65). At a review hearing, DCS determined that Mother's trailer was no longer safe or habitable, and that Mother had not regularly met with service providers to address parenting and life skills concerns. The trial court found that Mother struggled with following the visitation rules and that she used offensive language when speaking in front of the Children. Mother's unsupervised visits with the Children reverted to being supervised after Mother admitted to striking E.S. in the face because he had an "attitude." (Appellant's App. Conf. Vol. II,

p. 53). As for Father, the trial court also found that Father, who had failed to appear at the review hearing, had not complied with DCS's services or his case plan.

[14] By May 2018, Mother had made progress and was transitioned back to unsupervised visits with the Children. Sometime in May 2018, the Children had an overnight visit at Mother's home, but the Children "slept outside on the porch." (Appellant's App. Conf. Vol. II, p. 53). FCM Carroll was concerned about the Children sleeping on the porch since she had previously noted the "deteriorating condition of the porch and the leaking roof overhead" and also because the Children, who were allergic to mosquito bites, returned to Maternal Grandmother's home with large welts. (Appellant's App. Conf. Vol. II). On May 18, 2018, FCM Carroll visited Mother's trailer, and she observed "a smelly bag of trash with flies [and] a large piece of glass on the porch," the Children's bedrooms had clothing everywhere, "multiple piles of dog feces on the floor" and on the Children's "mattresses." (Appellant's App. Conf. Vol. II, p. 54). On May 26, 2018, FCM Carroll again visited Mother's home, and E.S. "pointed out two (2) piles of dog feces in the [C]hildren's room." (Appellant's App. Conf. Vol. II, p. 53). FCM Carroll additionally noted that there were house flies and the conditions inside the trailer was unsafe for the Children.

[15] In June 2018, FCM Carroll received a report that Mother had not engaged in any of DCS's services since March of 2018. On June 22, 2018, FCM Carroll visited Mother, but Mother was not present. However, looking through the windows, FCM Carroll saw "trash all over the porch" and "piles of dog feces

inside the home." (Appellant's App. Conf. Vol. II, p. 54). On June 29, 2018, FCM Carroll once again visited Mother's trailer and noted no improvement with the condition of Mother's home. On July 18, 2018, FCM Carroll visited Mother's trailer and "observed the same trash all over the porch including dirty diapers that had been untouched in the last month." (Appellant's App. Conf. Vol. II, p. 54).

[16]     On July 31, 2018, DCS filed petitions to terminate the parental rights of Mother and Father with respect to Z.M., L.M., and A.S. DCS likewise filed a petition to terminate Mother's parental rights to E.S. Following the filing of the termination petitions, in August 2018, after not complying for almost one and one-half years, Father began participating with his ordered services. This happened by "pure coincidence" after Father's mother, who was at the DCS's office for a separate matter, provided DCS with Father's updated contact information. (Appellant's App. Conf. Vol. II, p. 54). On September 17, 2018, FCM Carroll visited Mother's home and observed that Mother had ripped up the carpet and there was "black mold everywhere." (Appellant's App. Conf. Vol. II, p. 54). Mother's home was thereafter condemned, and she moved into her sister's home.

[17]     On November 12, and December 19, 2018, the trial court conducted a factfinding hearing on DCS's termination petitions. During the hearing, FCM Carroll opined that termination of Mother's parental rights to E.S., and Mother's and Father's parental rights to Z.M., L.M., and A.S. were in the Children's best interests. Guardian *ad litem* Laural French (GAL French), who

testified at the December hearing, stated that there were still no indications that Mother and Father were anywhere closer to reunification than when the case opened. She added that Mother did not have an appropriate home for the Children and had not "shown an ability to parent safely and appropriately for any length of time." (Tr. Vol. II, p. 193).

[18] On January 31, 2019, the trial court issued finding of facts and conclusion thereon terminating Mother's parental rights to E.S. Then on February 11, 2019, the trial court issued finding of facts and conclusion thereon terminating Mother's and Father's parental rights to Z.M., L.M., and A.S.

[19] Mother and Father now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## A. *Standard of Review*

[20] Mother and Father appeal the trial court's Order, terminating their parental rights to Z.M., L.M., and A.S. Mother also appeals the trial court's termination of her parental rights to E.S. A parent has an "interest in the care, custody, and control of his or her children [that] is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The Fourteenth Amendment to the United States Constitution thus safeguards "the traditional right of parents to establish a home and raise their children." *Id*. Nevertheless, it is well-established that "parental rights are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate

parental rights." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Termination of parental rights is appropriate where "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. We appreciate that the termination of a parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

[21] Upon review of a trial court's termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Rather, we "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* Additionally, the trial court issued specific findings of fact and conclusions thereon, which requires application of the two-tiered standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). A trial court has clearly erred "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005))

## II. *Termination of Parental Rights Statute*

[22]    In order to terminate a parent's rights to her child, DCS must prove:

> (A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

> * * * *

> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.*

[23] Father challenges the trial court's conclusion that there is reasonable probability that he would not remedy the reasons for the removal of Z.M., L.M., and A.S. or that he poses a threat to their well-being. Mother, on the other hand, challenges the trial court's conclusion that termination of her rights to the Children was in their best interest.

## B. *Failure to Remedy Conditions*[2]

[24] In considering whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside of the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, "the trial court must judge a parent's fitness as of the time of the

---

[2] Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and we affirmed the trial court's conclusion that the conditions that resulted in Z.M.'s, L.M.'s, and A.S.'s removal have not been remedied, we will not address whether the continuation of the parent-child relationship poses a threat to Z.M.'s, L.M.'s, and A.S.'s well-being.

termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[25] Father maintains that he was not responsible for his daughter's initial removal. While Father is correct that he had nothing to do with Z.M.'s, L.M.'s, and A.S.'s removal and it was due to Mother's inability to provide a safe and stable home, Father fails to show the conditions justifying his daughter's continued placement outside his care have been remedied.

[26] Following Z.M.'s, L.M.'s, and A.S.'s removal from Mother's home in September 2016, they were placed with Father. Four months later, Father requested that his daughters be removed from his home and be placed with Aunt since he was "pretty bad off on heroin and methamphetamines." (Tr. Vol. II, p. 110). After Father's request, the trial court approved the settlement change with Aunt.

[27] In his brief, Father asserts that he was "free from drugs and had been for approximately one year as evidenced by his hair follicle drug screen performed on August 16, 2018." (Father's Br. p. 15). We note that the negative drug screen occurred after DCS had filed the termination petitions. During the CHINS proceedings Father never completed any substance abuse treatment or performed drug screens. The trial court was not required to consider Father's late-breaking efforts, and it was within its discretion to weigh Father's history and consider any reasons for his daughters continued placement away from his care. *See In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013) (holding that a trial court may "disregard the efforts . . . made only shortly before termination and to weigh more heavily [a parent's] history of conduct prior to those efforts.").

[28] The dispositional order required Father to have safe and stable housing for Z.M., L.M., and A.S. Father argues that his mother's home, where he resided at the time of the termination hearing, was adequate housing for Z.M., L.M., and A.S., although it "was a work in progress." (Father's Br. p. 16). GAL French who visited Father's mother's home, testified that the home had a "very active" cockroach problem. (Tr. Vol. II, p. 193). Further, in the bedroom where Z.M., L.M., and A.S. were expected to sleep, had a "furnace" which did not have a cover, and it had "open working parts" which was a major safety concern. (Tr. Vol. II, p. 193). GAL French also was concerned with the fact that three dogs present in the home were "urinating on the sofa." (Tr. Vol. II, p. 193). Based on her visit, GAL French was unable to recommend that Z.M.,

L.M., and A.S., be placed back in Father's care since he lacked a safe and stable home.

[29] After absenting himself for more than one and one-half years on the pretext that he was trying to get himself clean from drugs, Father, involuntarily, began participating in DCS's services and visiting his daughters after DCS had initiated the termination petition. Moreover, Father's engagement transpired by coincidence when Father's mother provided DCS with Father's updated contact information. Additionally, there is no evidence that Father progressed to unsupervised visitations with his daughters or successfully completed substance abuse treatment.

[30] In the instant case, there was substantive evidence documenting Father's pattern of inability to otherwise successfully participate in services, and to provide adequate safe housing for his daughters. Thus, we conclude that the trial court's findings or conclusions that there was a reasonable probability that the continued placement of Z.M., L.M., and A.S. away from Father's care would not be remedied.

## C. *Best Interests of Children*

[31] Mother challenges the trial court's finding that termination of her parental rights is in the Children's best interests. The parent-child relationship is "one of the most valued relationships in our culture." *Bester*, 839 N.E.2d at 147 (quoting *Neal v. DeKalb Cnty. Div of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Thus, the purpose of terminating a parent-child relationship is to

protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. Permanency is a central consideration in determining a child's best interests. *Id*. Nevertheless, "the right of parents to raise their children should not be terminated solely because there is a better home available for the children." *In re K.S.*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).

[32] By the time of the termination hearing, the Children had been removed from Mother's care for nearly two years. The Children were living with Maternal Grandmother, they were well adjusted, they were having all their needs met, and Maternal Grandmother intended to adopt all of them.

[33] Mother contends that if the Children continue to reside with Maternal Grandmother, they will "continue to go to school in the same district, and they will continue to interact with the same friends." (Mother's Br. p. 14). Thus, Mother suggest that the termination of her parental rights was not geared to provide any "extra stability, consistency, or assurance," for the Children, rather, it was aimed at withdrawing DCS services which she desperately needs "to get her life back in order." (Mother's Br. p. 14). Mother then points to the

belated improvements she made in the wake of termination petitions to support her argument that termination of her parental rights to the Children was not in their best interest. Mother, who is diagnosed with bipolar disorder and depression, claims that she had "been consistently taking her medication for six weeks and was feeling much better." (Mother's Br. p. 13). Mother adds that shortly before the termination petitions were filed, she had been meeting with her counselor three times a week and had made progress, "although she needed more therapeutic services." (Mother's Br. p. 13). Thus, Mother posits that she has "demonstrated a genuine interest in the wellbeing of her [C]hildren and had taken proper steps to provide for her own mental health so that she could provide for their care and needs." (Mother's Br. p. 13).

[34] In concluding that termination would serve the Children's best interests, the trial court relied on Mother's historical conduct during the CHINS proceedings, as opposed to her late-breaking progress. Evidence was presented that Mother's bipolar disorder is managed better with medication. Throughout the CHINS proceedings, Mother was inconsistent in taking her medication, except for the six weeks preceding the termination hearings. As for the services that Mother claims she desperately needs, Mother expressed to DCS that the "reason why she was not compliant with services is because she believes she does not need them, and because she believes her [C]hildren never should have been removed in the first place." (Appellant's App. Conf. Vol. II, p. 69). FCM Carroll recommended termination of Mother's parental rights because Mother had not addressed her parental deficiencies, had not made any meaningful progress, did

not "have a safe and stable home, and [had] not address[ed] her mental health" issues. (Tr. Vol. II, p. 56). In terms of permanency, FCM Carroll opined that the Children were well cared for by Maternal Grandmother and adoption was in their best interest. GAL French testified that Mother did not have a safe and stable home for the Children, and she was not any closer to reunification than when the CHINS case opened. While Mother had made some belated progress by taking her medication, and seeing counselors, it is well-established that the trial court will look at a parent's overall conduct during the case. *See In re K.T.K.*, 989 N.E.2d at 1234. Given the totality of the evidence, we cannot conclude that the trial court's conclusion that termination of Mother's parental rights was in the Children's best interest was clearly erroneous.

## CONCLUSION

[35] Based on the foregoing, we conclude that the trial court's conclusions that there was a reasonable probability that the conditions meriting continued placement would not be remedied and that termination was in the Children's best interests were not clearly erroneous.

[36] Affirmed.

[37] Vaidik, C. J. and Bradford, J. concur